A. Pray
Paper No. 28

FOR PUBLICATION IN FULL

U. S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

---

Trademark Trial and Appeal Board

---

Bigfoot 4x4, lnc.
v.
Bear Foot, Inc.

---

Opposition No. 72,776 to application Serial No. 475,765 filed April 16, 1984.
Opposition No. 73,023 to application Serial No. 480,855 filed May 18, 1984.

---

Gravely, Lieder  & Woodruff and Charles P. Todt for Bigfoot 4x4, Inc.

Frank B. Janoski for Bear Foot, Inc.

---

Before Sams, Krugman and Hanak, Members.

Opinion by Krugman, Member:

Applications have been filed by Bear Foot, Inc. to register BEAR FOOT[1] and LITTLE BEARFOOT[2] as service marks for entertainment services, namely, conducting four wheel drive vehicle exhibitions.

Registration has been opposed in each instance by Bigfoot 4x4, Inc. under Section 2(d) of the Trademark Act on the ground that applicant's mark so resembles opposer's

---

[1] Application Serial No. 475,765 filed April 16, 1984 and the subject of Opposition No. 72,776.
[2] Application Serial No. 480,855 filed May 18, 1984 and the subject of Opposition No. 73,023.

previously used mark BIGFOOT for entertainment services, namely, conducting four-wheel-drive vehicle exhibitions as to be likely, when used in connection with applicant's services, to cause confusion, mistake or to deceive.

Applicant, in each of its answers to the oppositions, has denied the allegations therein. In addition, applicant has affirmatively alleged that opposer is barred from maintaining these proceedings under the doctrine of acquiescence, laches and/or estoppel in view of opposer's knowledge of applicant's use of the BEAR FOOT mark since 1982 and opposer's failure to commence any action until the filing of these oppositions.

In view of the identity of the parties and the issues to be determined, these proceedings were consolidated by order of the Board issued February 17, 1987, pursuant to a joint motion of the parties requesting such consolidation. The cases were thereafter presented upon the same record and briefs and the Board will decide both cases in a single opinion.

The record in these consolidated cases consists of the pleadings, the file of each application, testimony (with exhibits) taken by both parties and a number of applicant's answers to opposer's discovery requests relied on by opposer as part of its rebuttal evidence. Each party has filed a brief on the case and opposer has filed a reply brief. No oral hearing was requested.

Opposer has shown, through competent testimony, that it has continuously used the mark BIGFOOT in connection with conducting four-wheel-drive vehicle exhibitions since July 1976. These exhibitions are performed by means of an oversized "monster" pickup truck, a Ford pickup truck having an oversized engine and mounted on huge oversized tires. The BIGFOOT mark appears on opposer's trucks of which there are presently approximately six. The exhibitions are performed at various indoor and outdoor arenas across the country and comprise different events such as car crushing--where opposer's truck will actually ride up and over a line of automobiles, crushing them-- as well as mud runs, truck pulls, hill climbs, drag races, etc.

Opposer has enjoyed considerable publicity and recognition in connection with its BIGFOOT monster truck exhibitions. Numerous articles have appeared in various magazines and newspapers; a BIGFOOT fan club has come into existence and opposer has used the BIGFOOT mark on a line of ancillary type products, such as posters, T-shirts, toy vehicles, calendars, jackets, key chains, etc. Opposer owns a registration comprising a fanciful representation of a monster truck for entertainment services, namely, conducting four-wheel-drive vehicle exhibitions.[3] Opposer also owns

(3) Registration No. 1,251,879 issued September 20, 1983.

3

registrations for BIG FOOT for toy vehicles having four-wheel drive[4] and for toy vehicles.[5] Opposer's BIGFOOT truck has also appeared in at least one movie entitled "Take This Job and Shove It" and was shown on posters promoting the movie which were displayed at movie theaters where the movie was playing. A record album from the movie was also sold and the BIGFOOT truck appeared on the cover of the album.

Applicant, since 1982, has continuously used the mark BEAR FOOT in connection with services identical to those rendered by opposer. Applicant performs the exhibitions using a Chevrolet monster pickup truck on which the mark appears and engages in the same events as does opposer, that is, car crushes, truck pulls, mud runs, and the like. In 1984, applicant began using the mark LITTLE BEARFOOT to identify its services of conducting four-wheel-drive vehicle exhibitions. Again, applicant uses a monster Chevrolet pickup truck on which the mark appears, the only difference being the LITTLE BEARFOOT truck is somewhat smaller than the BEAR FOOT truck.

There is no dispute that the aforementioned services rendered by the parties are identical. In fact, the record shows that opposer and applicant often appear at the same exhibitions with their respective vehicles under the respective

(4) Registration No. 1,229,960 issued March 1, 1983.
(5) Registration No. 1,387,617 issued March 25, 1986.

4

marks. Since priority is not in dispute, the only issue to be
determined is whether use of the respective marks in connection
with the identical activities would be likely to result in
confusion as to source or sponsorship for purposes of Section
2(d) of the Trademark Act. We also must determine whether
opposer is estopped from opposing registration of applicant's
marks by virtue of laches and/or acquiescence, as asserted by
applicant as an affirmative defense.

Turning to the respective marks, it is clear from the
record that applicant was aware of opposer's BIGFOOT truck at
the time applicant adopted the marks sought to be registered
herein. The record shows that applicant's president as well as
another individual, formerly a partner of applicant's
president, visited opposer's truck parts store, inspected
opposer's BIGFOOT truck and purchased various truck parts in
connection with the building of applicant's own monster truck.
It is opposer's contention that applicant has attempted to
trade on the goodwill established by opposer by adopting
similar marks, and by using a monster truck similar in design,
size and color to opposer's BIGFOOT truck. Opposer argues that
applicant's mark BEAR FOOT and opposer's BIGFOOT mark both
begin with the letter "B" and end with the word FOOT and that
applicant, as the latecomer to the four-wheel-drive vehicle
exhibition field, had the duty to select a mark far enough
removed from opposer's previously used mark to avoid any
confusion.

5

Opposer places a great deal of emphasis on what it characterizes as instances of actual confusion. Opposer has introduced into the record, in connection with testimony of its witnesses, evidence showing that the BIGFOOT truck was used in a T.V. Guide advertisement and on some television promotional spots for a television show Knight Rider but the show actually featured the BEAR FOOT truck. Opposer also introduced letters from fans concerning this discrepancy. However, in our view, none of the letters from opposer's fans constitutes evidence of actual confusion. While these letters complain about or note the BIGFOOT truck's being advertised while the BEAR FOOT truck appeared on the television program, the letters, to the extent they are probative of anything, demonstrate that the authors were quite aware that the BIGFOOT and BEAR FOOT monster trucks are quite distinct from each other and not associated with the same entity.(6)

Other examples of "actual confusion" offered by opposer concern testimony from opposer's vice president of operations, James Kramer, to the effect that at least fifteen people came up to him at an exhibition in Chillicothe, Ohio

---

(6) The facts and circumstances surrounding the T.V. Guide advertisement for the Knight Rider television show are not sufficiently clear that any inferences can be fairly made as a result of this incident. Opposer appears to realize that there are insufficient facts upon which to base any conclusions from this incident and blames applicant for applicant's failure to provide any information concerning this matter although asked to do so during discovery. However, we agree with applicant that if opposer believed the information sought during discovery was relevant, it should have moved to compel answers to said discovery requests. Opposer failed to avail itself of that option.

6

where the BIGFOOT truck performed in July or August 1985, and told him they had just seen him recently in Stockdale, Ohio and asked him if he would be doing the same show as he did in Stockdale. Mr. Kramer then testified that the BIGFOOT truck had not appeared in Stockdale and indicated that the BEAR FOOT truck was the one performing in the Stockdale show. This evidence, however, is extremely vague and nonspecific. There has been no identification of the people who were allegedly confused. They have not testified herein and there has been no opportunity for cross-examination. In our view, then, this evidence is entitled to little, if any, probative value. See: Kraft, Inc. v. Balin, 209 USPQ 877 (TTAB 1981) and cases cited therein. Similarly lacking in probative value as evidence of actual confusion is testimony from Ron Magruder, someone identified only as being "associated with opposer." This testimony concerned a telephone call from someone named "Dennis" asking for tickets to see the BIGFOOT truck at a show in Richfield, Ohio since the caller had heard on television and radio ads that the BIGFOOT truck was going to be there. In fact, Mr. Magruder testified that the BIGFOOT truck was not in that Richfield show but, rather, the BEAR FOOT truck was. Aside from the fact that there is no indication of Mr. Magruder's specific association with opposer, the vague, nonspecific testimony relating to a telephone conversation with another vaguely identified person is entitled to little, if any, weight. Finally, with respect to the vague, nonspecific

7

Op. No. 72,776
Op. No. 73,023

testimony of William Candela, opposer's marketing vice president, regarding telephone calls received from unidentified persons concerning some toy trucks and the Candela testimony regarding alleged confusion by unnamed business associates and others in connection with a music video on the MTV network, said testimony is entitled to little if any, probative value for the same reasons noted with respect to the Kramer and Magruder testimony.

Opposer has introduced one exhibit (No. 79) in connection with the testimony of Robert Chandler, its president, in the nature of a misdirected letter addressed to Fred Shafer, applicant's president, concerning the BEAR FOOT truck. This letter was received by opposer. This letter appears to be the only evidence of any actual confusion of the type relevant to this proceeding under Section 2(d) of the Act, that is, confusion as to source or sponsorship arising from the use of the respective marks.[7]

Applicant basically denies that the marks are similar and argues that they present different commercial impressions.

After reviewing all the testimony and evidence and considering the arguments of the parties, we candidly concede

_____
[7] While this one misdirected letter is entitled to some weight in determining likelihood of confusion, it may be characterized as de minimis evidence of actual confusion. See: McCarthy, Trademarks and Unfair Competition, §23:2 (1984) and cases cited therein.

8

that we believe the question of likelihood of confusion vis-a-vis the BIGFOOT and BEAR FOOT marks is a "close call" and is reasonably in doubt. The marks have a number of similarities. Both the BIGFOOT and BEAR FOOT marks comprise two word marks having the identical second word and having a one-syllable first word beginning with the letter "B". The record shows that applicant was aware of opposer's use of the BIGFOOT mark at the time applicant adopted its BEAR FOOT mark and that at least one possible incident of actual confusion has occurred in the form of a misdirected letter meant for applicant but received by opposer. On the other hand, however, we note that both BIGFOOT and BEAR FOOT are terms that have recognizable meanings that are quite distinct. The term BIGFOOT connotes the mythical (or semimythical) creature supposedly existing in the Pacific Northwest of the North American continent. The term BEAR FOOT, by contrast, connotes the quite different impression of the foot of a bear. Reinforcing this impression is evidence that a pictorial representation of a bear often appears in conjunction with the BEAR FOOT and LITTLE BEARFOOT marks and that applicant's president has two live bears which occasionally make personal appearances in connection with the promotion of applicant's services.

9

Because the ultimate question of likelihood of confusion is reasonably in doubt, we believe it is proper to consider the equitable defenses of laches and/or acquiescence pleaded affirmatively by applicant herein.

As has often been stated, the equitable defense of laches and/or acquiescence is a type of estoppel which constitutes a ground for denial of relief upon a finding of conduct on the part of a plaintiff amounting to an assurance by the plaintiff to the defendant, either express or implied, that plaintiff will not assert its trademark rights against the defendant. See: CBS v. Man's Day Publishing Company, Inc., 205 USPQ 470 (TTAB 1980); State Steamship Company v. States Marine International, Inc., 183 USPQ 561 (TTAB 1974) and cases cited therein. The theory behind this defense is that it is incumbent upon the owner and prior user of a mark, having actual or constructive notice of another's use of a similar mark for the same or related goods and/or services, to take prompt affirmative action to assert his rights and protect them against what he believes to be infringement thereof and not to sit on those rights for an inordinate time and permit the subsequent user to build up a business and goodwill around the subsequent user's mark before taking action. See: States Steamship Company, supra. While the Board has stated that the equitable defense of laches and/or acquiescence cannot bar judgment in favor of a prior user if the marks and goods and/or services of the parties are such that confusion is inevitable,

10

the defense will be considered where likelihood of confusion is reasonably in doubt. See CBS, Inc., supra, and cases cited therein.

Turning to the facts in the present case, the record shows that Mr. Chandler, opposer's president,and Fred Shafer, the president of applicant, were acquaintances at the time applicant adopted the BEAR FOOT mark and that Mr. Chandler had actual knowledge of applicant's use of the BEAR FOOT mark for a monster truck used to perform four-wheel-drive vehicle exhibitions from its inception. In April 1982, applicant's BEAR FOOT truck participated in its first exhibition at a show in Richfield, Ohio at which opposer's BIGFOOT truck also performed. The record shows that Mr. Chandler helped arrange for applicant's appearance at this show. The record further shows that Mr. Chandler announced to the audience at this show the appearance of applicant's BEAR FOOT truck. No objection was made to Mr. Shafer at that time by Mr. Chandler. Subsequent shows in which both the BIGFOOT and BEAR FOOT trucks participated took place in 1983 and 1984 with no objection to applicant's use of the mark. In 1983 or 1984 someone from opposer's staff may have even contacted applicant to appear on a monster truck calendar being put together by opposer.

The record shows that since applicant's adoption and use of the BEAR FOOT mark in 1982, its business has grown.

11

Applicant subsequently began use of the LITTLE BEARFOOT truck in 1984 for performing four-wheel-drive vehicle exhibitions and has used some four trucks since 1982 with the BEAR FOOT name although at present, applicant owns two monster trucks. Applicant's employees have increased in number from one part-time and two full-time employees in 1982 to seven employees at present. The number of exhibitions performed by applicant has increased from some twenty weekends (three exhibitions per weekend) in 1982 to some forty weekends for each truck at the present time. In late 1984 or early 1985, applicant built a new, modern facility in which to work on its trucks at a cost of $60,000-$70,000. This was built to replace the outdated garage which applicant had used since 1982.

The first objection made by opposer to applicant's use of the BEAR FOOT and LITTLE BEARFOOT marks was a cease and desist letter dated January 24, 1985 from opposer's attorney to applicant's president.[8]  On October 16, 1985 and November 14, 1985, timely notices of opposition were filed against applicant's two applications.

Nothwithstanding the foregoing facts which are not essentially in dispute, opposer urges that there has been no

---

[8] Opposer's president, Mr. Chandler, testified that he did object in September 1984 to applicant's truck. However, the testimony is to the effect that Mr. Chandler was complaining about the similarity of the design of the respective trucks. Nothing in that portion of the testimony relates to any objection to applicant's use of the BEAR FOOT or LITTLE BEARFOOT marks.

12

laches or acquiescence because opposer never said or did anything which indicated it consented to or acquiesced in applicant's use of the BEAR FOOT and LITTLE BEARFOOT marks. The Board disagrees. It is clear that opposer had knowledge of applicant's use of the BEAR FOOT mark for over two-and-a-half years prior to the cease and desist letter sent in January 1985. We believe opposer's knowledge coupled with the silence as to any objections regarding applicant's use of the mark created an estoppel herein where applicant, during this period of time, acted on this silence by opposer to build up its business and the goodwill associated with the BEAR FOOT mark.

In our view, the circumstances brought out by this record constitute an almost classic example of laches and/or acquiescence on the part of opposer regarding applicant's use of BEAR FOOT on a monster truck used to perform four-wheel-drive vehicle exhibitions. While, as stated previously, the question of likelihood of confusion herein is reasonably in doubt, opposer's conduct in sitting on its rights for an inordinate period of time coupled with applicant's detrimental reliance on opposer's inaction where opposer had a duty to act results in opposer's being estopped from maintaining these oppositions. We conlcude that it would be

13

inequitable to preclude the registrations sought by applicant and that the oppositions, therefore, must fail.(9)

Decision:   Each of the oppositions is dismissed.

J. D. Sams

G. D. Krugman

E. W. Hanak
Members, Trademark Trial
and Appeal Board

NOV 3  1987

---

(9) While the LITTLE BEARFOOT mark was not adopted until sometime in 1984, it follows that opposer's failure to object to the BEAR FOOT mark and the Board's determination that opposer is precluded from maintaining its opposition to the BEAR FOOT mark due to laches and/or acquiescence also precludes opposer from maintaining its opposition to the LITTLE BEARFOOT mark.  It is apparent that the basis of the oppositions herein is opposer's belief that the term BEAR FOOT is confusingly similar to BIGFOOT and that the addition of the term LITTLE to BEARFOOT for exhibition services performed by a monster truck somewhat smaller in size than the BEAR FOOT truck is of minimal significance.  Moreover, to the extent that it may ultimately be found that the addition of the term LITTLE to BEARFOOT does result in a substantially different mark and that the laches/acquiescence defense is not applicable to the LITTLE BEARFOOT application, we hold that LITTLE BEARFOOT and BIGFOOT are sufficiently distinguishable that use of said marks in connection with identical services is not likely to cause confusion.

14